## CLARK v. WELCH.
### No. 3944.

Circuit Court of Appeals, First Circuit.
Jan. 26, 1944.

Claude R. Branch, of Boston, Mass. (John Dane, Jr., Allison L. Newton, and Robert W. Meserve, all of Boston, Mass., on the brief), for appellant.

Homer R. Miller, Sp. Asst. to Atty. Gen. (Samuel O. Clark, Jr., Asst. Atty. Gen., Sewall Key and A. F. Prescott, Sp. Assts. to Atty. Gen. and Edmund J. Brandon, U. S. Atty., and George F. Garrity, Asst. U. S. Atty., both of Boston, Mass., on the brief), for appellee.

Before MAGRUDER, MAHONEY, and WOODBURY, Circuit Judges.

MAHONEY, Circuit Judge.

The taxpayer brought this suit to recover $4,984.27, alleged overpayment of income taxes for 1936. In her return she failed to claim a deduction of $13,413.12, the cost to her of two hundred shares of participating preference stock of International Match Corporation which she alleges became worthless in 1936. The Collector contended that the stock became worthless prior to 1936. The jury in its special verdict determined this participating preference stock did not become worthless during the year 1936 so as to entitle the plaintiff to a deduction because of loss on said stock in that year for income tax purposes. Judgment was entered for the Collector and the taxpayer has appealed.

No claim is here made that the evidence was insufficient to sustain the verdict. The appeal is based solely on alleged errors in the judge's charge to the jury and on his comments on the evidence.

In 1932 the International Match Corporation had outstanding approximately 1,350,000 shares of participating preference stock and 1,000,000 shares of common stock. Almost all of its common stock was held by the Swedish Match Company, a Swedish corporation which was a subsidiary of A/B Kreuger & Toll. These three companies were dominated and directed by Ivar Kreuger. On April 19, 1932, shortly after Kreuger's suicide, the

International Match Corporation was adjudicated a bankrupt. The International paid no dividends after January 15, 1932. Claims of debenture holders in the sum of $97,948,837.77 were allowed in the bankruptcy proceedings, leaving a deficiency of at least $61,048,479.34 in assets necessary to pay these holders. These debentures were entitled to priority and payment out of the assets of the corporation and its trustee in bankruptcy before any payment of dividends from that source could be made to the holders of the preference stock. The lawyer and certified public accountant who represented the trustee in bankruptcy in investigations as to the value of assets, testified that the maximum value of International's assets as they appeared in 1932 was $67,860,471.85, which would leave a deficit for the debenture holders of over $30,000,000. On November 1, 1932, the quotations for the debentures on the New York Stock Exchange were, as to those due in 1947, 65 bid and 102 asked, and for those due in 1941, 65 bid and 70 asked on each $1000 principal amount of the debentures. In 1932 Poor's Industrial Volume rated the debentures as a very speculative investment. In April, 1932, the price of preferred stock on the New York Stock Exchange dropped precipitously to a low of three-eighths of a dollar per share and in May, 1932, to a low of one-quarter of a dollar per share. The preference stock was struck off the list of the Exchange on May 8, 1932, because the corporation failed to maintain a transfer office in New York City.

When the participating preference stock of International Match Corporation was issued, the Swedish Match Company agreed with that corporation and the holders of its shares of preference stock that should the income of International be insufficient to pay the cumulative dividends on its preference stock, the Swedish Match Company would reduce the rate of dividends paid on its own capital stock. Each participating preference stockholder became a party to this agreement by accepting a stock certificate. The Swedish Match Company maintained that these agreements between it and International and the preference stockholders of the latter company were invalid and unenforceable. On July 1, 1936, in order to facilitate the settlement of intercompany claims of its subsidiaries and purchase of certain assets by Swedish Match Company, the latter entered into an agreement whereby an offer of settlement of the claims of these stockholders was to be made by a third corporation called Imco Participating Co., Ltd. About July, 1936, pursuant to this agreement, an offer was made to exchange one of the participating certificates in Imco for each two participating preference shares of International. The taxpayer did not avail herself of the option which expired November 4, 1936.

The accounting firm of Price, Waterhouse & Company was retained to make an examination of the Kreuger group of companies. Their final report covering the period from 1917 to March 31, 1932, was dated November 26, 1932. In a letter dated October 7, 1932, the Protective Committee for the holders of the preference stock informed them that an investigation of the affairs of International Match Corporation by Price, Waterhouse & Co. "will probably show that International Match Corporation's liabilities are substantially in excess of assets" and expressed the hope "that some plan of reorganization may be worked out in which the holders of International Match Corporation participating preference stock will be given appropriate recognition".

 The pertinent sections of the Internal Revenue Code, Revenue Act of 1936, c. 690, 49 Stat. 1648, § 23(e) (2), 26 U.S. C.A. Int.Rev.Code, § 23(e) (2), and Regulations 94, Arts. 23(e)-1, 4, are set forth in the margin.[1] In order to prevail, the taxpayer had to prove that the stock be-

[1] "Sec. 23. Deductions from Gross Income.

"In computing net income there shall be allowed as deductions:

＊　　　＊　　　＊　　　＊

"(e) *Losses by individuals.* In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise—

＊　　　＊　　　＊　　　＊

"(2) if incurred in any transaction entered into for profit, though not connected with the trade or business; or ＊ ＊ ＊."

Treasury Regulations 94, promulgated under the Revenue Act of 1936:

"Art. 23(e)-1. *Losses by individuals.*—

＊　　　＊　　　＊　　　＊

"In general losses for which an amount may be deducted from gross income must be evidenced by closed and completed transactions, fixed by identifiable events, bona fide and actually sustained during the taxable period for which allowed. Substance and not mere form will govern in deter-

came worthless in 1936, not prior to that year as contended by the Collector. The trial judge charged the jury that "stock is not worthless if it has a real prospective value, but it is worthless if only a miracle can make that prospect become true * * * Loss is sustained only when all likelihood of securing a return on the investment has effectively been destroyed".[2] One of the taxpayer's contentions is that the trial court erred in refusing to charge that "loss is sustained only when all chances or possibilities of securing a return on the investment have effectively been destroyed". There was no error in refusing so to charge.

Although the requested charge would be of benefit to a taxpayer where, as here, the Collector contends that the stock became worthless in a prior year, it would not be a fair rule to other taxpayers in general whose stock becomes worthless. Where there is any question raised as to whether stock had as yet become worthless as of the time claimed by the taxpayer, the requested and refused charge would place an almost insuperable obstacle in the taxpayer's path. If there were even a remote chance or possibility of a return on the investment, the taxpayer could not be allowed the deduction. To demonstrate the impracticability of such a rule, one need only advert to the proposition that under it the taxpayer could not take his deduction until he had negatived every extreme chance or possibility of a return on the investment, even to disproving the remote possibility of there being oil deposits in the earth beneath the corporation's defunct factories. The rule should not require the taxpayer to prove "beyond imaginable peradventure that these assets might not be snatched at by some impressionable buyer, who did not share their owners' estimate of their value." De Loss v. Commissioner, 2 Cir., 1928, 28 F.2d 803, 804, certiorari denied, 1929, 279 U.S. 840, 49 S.Ct. 254, 73 L.Ed. 987.

In United States v. White Dental Co., 1927, 274 U.S. 398, 47 S.Ct. 598, 71 L.Ed. 1120, the taxpayer's German subsidiary, all of whose capital stock was owned by the taxpayer, was seized by the German government as enemy property in 1918; in 1920 the seized assets were released; in 1932 these assets were sold for $6000. The Supreme Court held that the stock became worthless in 1918 and permitted the loss to be deducted in that year. The court said, page 402, of 274 U.S., page 600 of 47 S.Ct.,

"The quoted regulations, consistently with that statute, contemplate that a loss may become complete enough for deduction without the taxpayer's establishing that there is no possibility of an eventual recoupment. It would require a high degree of optimism to discern in the seizure of enemy property by the German government in 1918 more than a remote hope of ultimate salvage from the wreck of the war. The taxing act does not require the taxpayer to be an incorrigible optimist."

To the same effect are Hinrichs v. Helvering, 1938, 68 App.D.C., 206, 95 F.2d 117; Cahn v. Commissioner, 9 Cir., 1937, 92 F.2d 674; Commissioner v. John Thatcher & Son, 2 Cir., 1935, 76 F.2d 900; Commissioner v. Highway Trailer Co., 7 Cir., 1934, 72 F.2d 913; Brown v. Commissioner, 1 Cir., 1931, 54 F.2d 563, certiorari denied 1932, 286 U.S. 556, 52 S.Ct. 639, 76 L.Ed. 1291.

The taxpayer contends that the White Dental Co. case is not in point because the question there involved was recoupment of a loss on stock, whereas here the question is whether the stock became worthless in a given year. We see no reason why the test should be different in the two situations. The Second Circuit saw no such distinction when in De Loss v. Commissioner, supra, a case like the one at bar, it cited and followed United States v. White Dental Co., supra, nor did it in Young v.

mining deductible losses. Full consideration must be given to any salvage value and to any insurance or other compensation received in determining the amount of losses actually sustained. See section 113 (b).

*　　*　　*　　*

"Art. 23(e)-4. *Shrinkage in value of stocks.—* * * *

"If stock of a corporation becomes worthless, its cost or other basis as determined and adjusted under section 113 is deductible by the owner for the taxable year in which the stock became worthless, provided a satisfactory showing is made of its worthlessness. * * *".

[2] The trial judge had first offered to charge that "loss is sustained only when all reasonable probability of securing any return on investment * * *" but the taxpayer said that that did not satisfy her. According to Webster's New International Dictionary "likelihood" means probability.

Commissioner, 2 Cir., 1941, 123 F.2d 597, in which it dealt with the same stock here in issue.

The charge requested by the taxpayer was taken from a statement in Olds & Whipple, Inc., v. Commissioner, 2 Cir., 1935, 75 F.2d 272, 275: "A real loss is sustained when all chances or possibilities of collection have been effectively destroyed." [3] The words referred to in the Olds & Whipple opinion do not constitute the rule followed by the Circuit Court of Appeals for the Second Circuit which decided that case. In Young v. Commissioner, supra, pages 599, 600 of 123 F.2d that court said:

"Certain *speculative chances* of getting something out of adjustments or litigations on the part of International, against which the pessimistic letter of October 7, 1932, stood as an early and well founded warning, furnished no sound basis for any hope of an ultimate substantial value. * * * The ability to get some trifling price was not sufficient, in our opinion, to show that the stock was not in every real sense worthless." (Italics supplied.)

The court made no mention of Olds & Whipple, Inc., v. Commissioner, but rather to the contrary said:

"Awaiting the outcome of an internecine conflict, when the situation in 1932 not only seemed, but actually turned out to be, so hopeless, did not defer her obligation to claim any deduction that she might seek to obtain under Section 23(e) of the Revenue Act of 1936, 26 U.S.C.A. Int.Rev.Code, § 23(e), during the first year that it was available. United States v. White Dental Co., 274 U.S. 398, 47 S.Ct. 598, 71 L.Ed. 1120; De Loss v. Commissioner, 2 Cir., 28 F.2d 803."

Although Jones et al. v. Commissioner, 9 Cir., 1939, 103 F.2d 681, 685, recited the language of the Olds & Whipple case, it also said:

"While it is also quite true 'that a loss may become complete enough for deduction without the taxpayer's establishing that there is no possibility of an eventual recoupment', and that 'The taxing act does

not require the taxpayer to be an incorrigible optimist' (United States v. White Dental Co., 274 U.S. 398, 402, 403, 47 S. Ct. 598, 600, 71 L.Ed. 1120) nevertheless, cessation of business is not conclusive, though, of course, not every possibility of value will be considered."

The Olds & Whipple language also appears in the majority opinion in Nelson v. United States, 8 Cir., 1942, 131 F.2d 301, but there the court was convinced from the fact that the corporation operated at a profit in the years immediately preceding liquidation, that if allowed to continue the stockholders would receive a substantial return; hence that the stock had value until the time of liquidation.

■ We turn now to the alleged error in the judge's comments on the evidence. Although the trial judge here expressed an opinion on the facts, he also told the jury, "ultimately, you are the triers of the facts in this case, and it is up to you to decide the questions of fact which have been put before you * * *. I caution you, you are not required to follow my reasoning on that issue. Ultimately, it is you". The judge used the word "many" in reference to thirteen auction sales of the stock in which the costs of the sale were not recovered, and referred to the two hundred and ninety-seven "over the counter" sales as "more": "I said that there were many sales in which less than the cost of the sale was realized by the seller. In fairness, I should say there were more sales in which the cost plus something was realized by the seller, so that he came out a little bit ahead." He refused to refer to these latter transactions as "a great many more". In view of the fact that these sales represented transfers of less than five per cent of the shares outstanding and considering that these exact figures could only be derived by careful computation from a mass of jumbled evidence of sales in the record, we cannot say there was reversible error in the failure to say "a great many more" instead of "more".

The judgment of the District Court is affirmed.

---

[3] That case cited Deeds v. Commissioner, 6 Cir., 47 F.2d 695, 697, which, in allowing a deduction for bad debts, merely remarked, "all chance or possibility of collection had been effectively destroyed." It was not there intended to set up a different rule from that of United States v. White Dental Co., supra, as the latter was cited and followed in the same paragraph.